# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Peters*, 2011 IL App (1st) 092839

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY PETERS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-09-2839 |
| Filed | August 22, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for predatory criminal sexual assault and criminal sexual assault and his sentence to natural life were upheld over his contentions that the trial court violated Supreme Court Rule 431(b) and that his sentence violated the proportionate penalties clause, but the mittimus was corrected to accurately reflect his convictions. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-16590; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on
Appeal

Stephen L Gentry, of State Appellate Defender's Office, of Chicago, for
appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon
Walters, and Anne L. Magats, Assistant State's Attorneys, of counsel),
for the People.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with
opinion.

Presiding Justice Hall and Justice Hoffman concurred in the judgment
and opinion.

# OPINION

¶ 1     Defendant, Jerry Peters, appeals his convictions of predatory criminal sexual assault of a child and criminal sexual assault and his sentence of natural life imprisonment. Defendant contends: (1) the circuit court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984); (2) his mandatory natural life sentence violated the proportionate penalties clause; and (3) his mittimus should be corrected to accurately reflect the counts of which he was convicted. We affirm defendant's convictions and sentence and correct the mittimus.

¶ 2     Defendant was charged with three counts of predatory criminal sexual assault of a child and three counts of criminal sexual assault. The predatory criminal sexual assault charges alleged that, on or about March 1, 2001, through August 5, 2003, defendant, who was 17 years of age or over, knowingly committed an act of sexual penetration upon J.J., who was under 13 years of age, by making contact between: his penis and J.J.'s vagina (count I); his penis and J.J.'s anus (count II); and his mouth and J.J.'s vagina (count III). The criminal sexual assault charges alleged that, on or about August 6, 2003, through March 25, 2004, defendant knowingly committed an act of sexual penetration upon his stepdaughter J.J., who was under 18 years of age, when he made contact between: his penis and J.J.'s vagina (count IV); his penis and J.J.'s anus (count V); and his mouth and J.J.'s vagina (count VI).

¶ 3     During jury selection, the court advised the venire of "certain fundamental principles" that "apply to this trial like they've applied to every other trial in the history of our country." First, the court advised the venire that "a criminal trial begins with the person accused of a crime presumed to be innocent." The court further explained:

        "This is how a criminal trial starts. Whoever walks in accused of a crime walks in the court presumed to be innocent. We don't take the position, well, if he's accused, he

-2-

must have done something wrong or else they wouldn't be held for trial. They don't take the position, somebody did something wrong or else there wouldn't be a trial. An accused begins proceedings in court presumed to be innocent. Is there anybody here who has a problem with that most fundamental proposition of American justice, that when a criminal trial starts, the accused is presumed to be innocent? If you have a problem with that, please raise your hand. No hands are raised."

¶ 4     The court then explained that a person becomes accused of a crime when the government brings formal charges against him by filing a piece of paper listing those charges. The court stated that the fact the paper was filed does not necessarily mean defendant did something wrong. Then the court asked, "[I]s there anybody here who would hold it against the accused simply because someone in the government filed a piece of paper in court indicating what the formal charges are? If you have feelings like that, please raise your hand. No hands are raised."

¶ 5     The court further explained:

"The only way someone can be guilty of a crime is if the government who brought the charges against the accused is able to prove the accused guilty beyond a reasonable doubt. *** The government has the burden of proof. They have to prove the case beyond a reasonable doubt. You don't guess somebody guilty. You don't make a hunch they're guilty. You don't think they're guilty. The only way you can be guilty is if the government brought the charge and proved guilt beyond a reasonable doubt. Anybody have a problem with that proposition? The only way you can be guilty is if the government [that] brought the case can prove guilt beyond a reasonable doubt. Do you have a problem with that, please raise your hand? No hands are raised."

¶ 6     Finally, the court discussed one "last proposition":

"In a criminal trial, the person accused of a crime does not have to prove their innocence. In a criminal trial, the burden of proof is on the government, they have to prove guilt beyond a reasonable doubt. An accused doesn't have to prove anything at all. An accused does not have to testify. It is their perfect right not to testify. They don't have to call any witnesses on their own behalf. It is their perfect right not to call witnesses on their own behalf. Hypothetically speaking, there can be a criminal trial. The government may call a hundred witnesses against the accused. The accused, which is their perfect right, chooses not to testify, and which is also their right, chooses not to call any witnesses on their own behalf. After hearing from a hundred people on one side, no people on the other, there can be a reasonable doubt the jury find [*sic*] as to whether the government has indeed proven their case as required. With that said, is there anybody here who would hold it against the accused if they did not testify, which is their perfect right, or did not call any witnesses on their own behalf, which is their right? Anybody here who feels the accused has some responsibility in a criminal case to prove their innocence? If you have feelings like that, please raise your hands. No hands are raised. Okay."

¶ 7     The court also individually asked each venireperson who was selected for the jury if he

or she would hold it against defendant if he did not testify. Each person selected replied that he or she would not.

¶ 8     At trial, J.J. testified she was 10 years old in 2001 and lived with her mother, uncle, and brother. Her mother was dating defendant at that time, and he also had been living in their home for two or three years. In March 2001, J.J. came home from school at approximately 3:20 p.m. Defendant was home, and he asked J.J. to come into the bedroom he shared with her mother. Defendant asked J.J. to sit on the bed and take off her clothes. J.J. did so. Defendant took off his clothes and told J.J. to lie down. Defendant climbed on top of J.J., applied baby oil to her vaginal area, and inserted his penis into her vagina. After he was finished, defendant told J.J. not to tell anyone or else she would "go to DCFS" and never see her mother again. Defendant also threatened to hurt her mother if J.J. told anyone what he had done. One week later, defendant again asked J.J. to come into his room, where he inserted his penis into her vagina. This continued to happen two to three times a week for three years. J.J. testified she saw "cum" come out of defendant's penis on the occasions when he inserted it into her vagina. J.J. testified defendant also would place his mouth on her vagina and move his tongue back and forth. Defendant also tried to put his penis inside her mouth, but he was unable to do so because she kept moving and he eventually grew tired of fighting her.

¶ 9     J.J. testified defendant married her mother in September 2001. Prior to the marriage, J.J. never told her mother about what defendant was doing because she was too afraid. J.J. wrote about the incidents in a diary and left it out in the hope that her brother would read it and come to her aid. Instead, defendant discovered the diary and ripped it up. Then he called her into his room, told her not to write about what he had been doing to her, and told her to lie down and take off all her clothes. He inserted his penis into her vagina, then he told her to turn over and he inserted his penis into her anus. J.J. subsequently told her best friend, Adrienne, about what defendant had been doing to her.

¶ 10    J.J. testified that, on March 25, 2004, she came home from school and defendant asked her to come into his room "like every other day." Defendant told her to lie down and take off all her clothes, after which he inserted his penis into her vagina. Defendant later left and picked up her mother from work in order to go bowling. After defendant left, J.J.'s brother, K.J., called her and she told him that defendant had been "messing" with her. K.J. drove over and picked her up and then drove to the bowling alley, where they saw defendant and their mother. K.J. began screaming and cursing at defendant. Defendant said nothing in response. J.J. left the bowling alley with her mother and K.J. and went to the hospital where she underwent a physical examination. She also spoke with police while at the hospital.

¶ 11    K.J. testified that, on March 25, 2004, he was working at a barbershop when he received a phone call from a female who stated her name was "Tweet." K.J. did not know this person. They had a brief conversation about J.J. After hanging up the phone and finishing work, K.J. called J.J. and asked her if defendant had been "messing with her." J.J. said yes and began crying. K.J. drove over and picked up J.J. and his eight-year-old son, whom J.J. was babysitting. K.J. drove around until he met up with his friend, Lamont Jones. K.J. left J.J. and his son in the car while he got out to speak with Lamont. Lamont gave K.J. a handgun. K.J. placed the gun in the waist of his pants and he put the clip in his pocket. Then he

dropped his son off at his mother's house and drove over to the bowling alley. K.J. told J.J. to go inside the bowling alley; as she did so, he finished parking, took the clip out of his pocket, and put it inside the gun. Then he walked into the bowling alley, where he saw defendant and his mother. K.J. cursed at defendant and yelled out that he had "f***ed" his sister. Defendant made no response but continued bowling. His mother came over, and K.J. told her that defendant had been "f***ing" J.J. Then K.J. pulled the gun out of his pocket and pointed it at defendant's groin. The owner of the bowling alley stepped between K.J. and defendant, grabbed the gun, and told K.J. "It ain't worth it." A couple of men dragged K.J. outside the bowling alley. His mother and J.J. joined him outside. K.J. testified they drove to their mother's house and then to the hospital.

¶ 12      J.J.'s mother, Anita P., testified she began dating defendant in 1996 and that he moved in with her one year later. Anita's daughter, J.J., and her youngest son, T.J., as well as their uncle Clarence, also lived with them. Anita married defendant in September 2001. Anita worked at a messenger service in 2001 and began working at a bank in 2002. She usually arrived home at 6 p.m. While she was at work, defendant was responsible for picking J.J. up from school.

¶ 13      Anita testified that, on March 25, 2004, she and defendant went bowling after work. While they were at the bowling alley, J.J. and K.J. came in and K.J. began cursing and saying that defendant had been "f***ing" J.J. for three years. While K.J. was saying this, J.J. was crying. Defendant made no response but continued bowling. Anita walked over to K.J. to "see what was going on." Defendant subsequently called Anita into the locker room and told her not to "bring DCFS into [their] life right now." Anita asked defendant about what was going on, but he said that he could not talk about it right now. Anita left the bowling alley and went home with K.J. and J.J. Then they took J.J. to the hospital. Anita never saw defendant after that night.

¶ 14      Nanette Kelly testified she is a registered nurse and she examined J.J. on March 25, 2004, at the hospital. J.J. had stated that she had been sexually assaulted. J.J.'s underwear was collected, and Doctor Carrie Wilson took a vaginal swab, pubic comb, and blood sample from J.J. using a sexual assault kit. Nurse Kelly testified that J.J.'s hymen was broken. Officer Zdziarski picked up the sexual assault kit.

¶ 15      Doctor Robin Cotton was qualified as an expert in the field of DNA analysis and testified that, from 1988 to 2006, she worked for Cellmark Diagnostics, later called Orchid Cellmark, which was a DNA testing lab. Her primary duties were to review the work of other analysts at the lab. Doctor Cotton testified that, on April 29, 2004, Orchid Cellmark received a blood specimen and four vaginal swabs taken from J.J. DNA profiles were generated from the blood sample and from semen on the vaginal swabs.

¶ 16      Detective Mike Dimeo testified that, on August 12, 2008, defendant "came into contact" with Chicago police officers "concerning a traffic matter" and was placed into custody based on a prior investigative alert that had been issued for defendant based on his alleged involvement in J.J.'s sexual assault. Michael Scarriot, an evidence technician for the Chicago police department, testified that, on August 13, 2008, he took a buccal swab from defendant's inner mouth. The swab was subsequently sealed and inventoried.

¶ 17    Janice Martino, a forensic scientist with the Illinois State Police, was qualified as an expert in the field of forensic DNA analysis and testified that she received defendant's buccal swab, from which she generated a DNA profile. She compared this DNA profile with the DNA profile generated by Orchid Cellmark from the vaginal swabs taken from J.J. Ms. Martino concluded that the DNA profile from defendant's buccal swab matched the DNA profile from J.J.'s vaginal swabs. Ms. Martino testified that the DNA profile from J.J.'s vaginal swabs would be expected to match only 1 in 100 quadrillion black individuals, 1 in 3.4 quintillion white individuals, or 1 in 12 quintillion Hispanic individuals.

¶ 18    Detective Dimeo testified that he met with defendant on August 13, 2008, in a police department interview room. Detective Dimeo gave defendant his *Miranda* rights and defendant stated he understood them. Defendant told Detective Dimeo that he had a "special relationship" with J.J., in which he had penetrated her vagina with his penis numerous times, had touched his mouth to her vagina numerous times, and had fondled her breasts on multiple occasions. Defendant also stated that he had placed his penis in J.J.'s hands on two occasions and that, on one occasion, he had placed his penis to her anus.

¶ 19    Detective Dimeo testified that, at the conclusion of their conversation, he contacted Assistant State's Attorney (ASA) Gerardo Tristan, who arrived at approximately 8:45 p.m. At approximately 9 p.m., Detective Dimeo and ASA Tristan went into the room with defendant. ASA Tristan gave defendant his *Miranda* rights again, and defendant stated he understood them. Defendant gave essentially the same statement to ASA Tristan that he had given to Detective Dimeo. Defendant then agreed to give a written memorialization of his statement.

¶ 20    ASA Tristan testified that, at approximately 9 p.m. on August 13, 2008, he met with defendant in an interview room at the police station. Detective Dimeo was also present. ASA Tristan introduced himself as a prosecutor and gave defendant his *Miranda* rights, and defendant stated he understood. They engaged in a conversation lasting about 20 minutes, during which defendant admitted he had been having sex with his stepdaughter. Defendant agreed to have his statement memorialized in writing. ASA Tristan wrote out the statement, which was then signed by him, Detective Dimeo, and defendant.

¶ 21    ASA Tristan read defendant's statement to the jury. Defendant stated he first met J.J. when he began dating her mother, Anita. Defendant married Anita in September 2001. Prior to that date, around March 2001, J.J. grabbed and stroked his penis as defendant read her a bedtime story. Two or three days later, J.J. again grabbed and stroked his penis. About one week later, defendant engaged in sexual intercourse with J.J. He placed his penis inside her vagina and moved it back and forth, and then he ejaculated on the bed. Defendant stated that they continued to engage in sexual intercourse from March 2001 to March 25, 2004. The sexual intercourse took place either in his room or in J.J.'s room.

¶ 22    Defendant stated that he remembered one time when he placed his penis in between J.J.'s "rear cheeks." Defendant stated he sometimes placed his tongue on J.J.'s vagina and penetrated her vagina with his tongue. He rubbed her vagina with his fingers and with baby oil. He also rubbed J.J.'s breasts over her shirt and under her shirt. He last had sexual intercourse with J.J. on March 25, 2004. That night, J.J. and her brother came into the

bowling alley and confronted defendant about his sexual intercourse with J.J.

¶ 23 Also at trial, two sisters, M.C. and Y.D., testified they too were sex crime victims of defendant. M.C. testified that, in 1988, when she was 14 years old, her mother was dating defendant. In November or December 1988, M.C. came home from school and defendant was there. He made her sister Y.D. go into the bathroom, and then he came out with an extension cord around his neck. He told M.C. to take off all her clothes except for her underwear and lie down on the bed. M.C. did as she was told. Defendant hit her several times with the extension cord. Then he asked her whether she was ready to be a child or a woman. M.C. said she was ready to be a woman. Defendant then made M.C. take off her underwear and lie back down on the bed. Defendant took off his robe, got on top of M.C., and put his penis in her vagina. Defendant continued to have sexual intercourse with M.C. weekly for approximately two years. M.C. testified that defendant also put his penis in her mouth. Defendant told M.C. not to tell anyone because her mother would not believe her and nobody else would ever love her again. M.C. eventually told her mother and the police about what defendant had been doing to her.

¶ 24 M.C.'s sister, Y.D., testified that, when she was six years old, her mother began dating defendant. In 1988, when Y.D. was eight years old, defendant took her to McDonald's and then they went back to his apartment, where he asked her to take off her clothes and lie on the bed. She did as she was told. Defendant then took off his clothes, got on top of her, and put his penis in her vagina. Defendant continued to have sexual intercourse with Y.D. weekly for approximately two years. Y. D. testified that defendant also put his penis in her mouth. Defendant told her never to tell anyone and bribed her with candy and chips. In 1990, Y.D. told her mother and eventually spoke with the police.

¶ 25 At the close of all the evidence, the circuit court instructed the jury, in pertinent part, that defendant is presumed innocent of the charges against him, that the State has the burden of proving defendant guilty beyond a reasonable doubt, that defendant is not required to prove his innocence, and that the fact defendant did not testify must not be considered in any way in arriving at the verdict.

¶ 26 The jury convicted defendant of two counts of predatory criminal sexual assault of a child and three counts of criminal sexual assault. The circuit court denied defendant's motion for a new trial. During sentencing, the State introduced a certified copy of conviction stating that defendant had been convicted of aggravated criminal sexual assault on September 26, 1991, for which he was sentenced to seven years' imprisonment. The circuit court sentenced defendant to natural life in prison pursuant to section 12-14.1(b)(2) of the Criminal Code of 1961, which states in pertinent part:

"A person who is convicted of *** the offense of predatory criminal sexual assault of a child after having previously been convicted of the offense of *** aggravated criminal sexual assault *** shall be sentenced to a term of natural life imprisonment." 720 ILCS 5/12-14.1(b)(2) (West 2008).

¶ 27 Defendant filed a motion to reconsider his sentence, which the circuit court denied. The court stated it "would have found a sentence other than natural life had it been available." Defendant filed this timely appeal.

¶ 28 First, defendant contends the circuit court violated Rule 431(b) when it failed to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *Zehr*. Where an issue concerns compliance with a supreme court rule, review is *de novo*. *People v. Ware*, 407 Ill. App. 3d 315, 353 (2011).

¶ 29 In *Zehr*, our supreme court held that a trial court erred during *voir dire* by refusing defense counsel's request to ask questions about the State's burden of proof, the defendant's right not to testify and his right not to have to offer evidence in his own behalf, and the presumption of innocence. *Zehr*, 103 Ill. 2d at 476-78. The supreme court held, "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477.

¶ 30 To ensure compliance with *Zehr*, the supreme court amended Rule 431(b) in 1997 to provide, "[i]f requested by the defendant," the court shall ask the prospective jurors whether they understand and accept the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. May 1, 1997). The rule sought "to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). The appellate court held that Rule 431(b), as amended in 1997, "does not require the judge to ask the questions unless defendant's counsel has asked the court to do so." *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006); see also *People v. Foreman*, 361 Ill. App. 3d 136 (2005).

¶ 31 Effective May 1, 2007, the supreme court again amended Rule 431(b), deleting the language "[i]f requested by the defendant," and leaving the remainder of the rule unchanged. Rule 431(b) now reads:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 32 Thus, Rule 431(b), as amended effective May 1, 2007, currently imposes a *sua sponte* duty on the circuit court to question each potential juror as to whether he understands and accepts the *Zehr* principles. Such questioning of the potential jurors is no longer dependent upon a request by defense counsel.

¶ 33 Defendant's trial took place after the effective date of the 2007 amendments. Therefore, the 2007 amended version of Rule 431(b) is controlling.

¶ 34 Defendant contends the circuit court violated Rule 431(b) by "combin[ing] the four

[*Zehr*] principles into two" and by failing to ascertain whether the potential jurors understood and accepted the principles. Defendant concedes he did not object to the circuit court's alleged failure to comply with Rule 431(b), but argues "forfeiture is inapplicable" because: (1) the effect of the 2007 amendment, which required the circuit court to ask the four questions *sua sponte*, would be negated if defendant was required to object thereto; and (2) the waiver rule is relaxed when the trial judge's conduct is at issue. See *People v. Dameron*, 196 Ill. 2d 156, 171 (2001). Defendant also contends the court's alleged failure to comply with Rule 431(b) cannot be held harmless. In the alternative, defendant contends we should review the court's alleged failure to comply with Rule 431(b) for plain error.

¶ 35    Our supreme court recently addressed these issues in *People v. Thompson,* 238 Ill. 2d 598 (2010). In *Thompson*, the defendant, Angelo Thompson, was convicted of aggravated unlawful use of a weapon and sentenced to one year in prison. *Thompson*, 238 Ill. 2d at 601. On appeal, Thompson argued his conviction should be reversed because the trial court failed to comply with Rule 431(b). *Thompson*, 238 Ill. 2d at 605. Specifically, the trial court did not question whether any of the prospective jurors understood and accepted that Thompson was not required to produce any evidence on his own behalf. *Thompson*, 238 Ill. 2d at 607. Further, the trial court did not ask the prospective jurors whether they accepted the presumption of innocence. *Thompson*, 238 Ill. 2d at 607. Thompson did not object to the alleged Rule 431(b) violation or include it in his posttrial motion, but the appellate court found the alleged error was subject to plain-error review. *Thompson*, 238 Ill. 2d at 605. The appellate court held that the trial court committed reversible error by failing to comply with Rule 431(b) and so reversed Thompson's conviction and remanded for a new trial. *Thompson*, 238 Ill. 2d at 605.

¶ 36    On appeal to the supreme court, the State first contended that a violation of Rule 431(b) is not a structural error requiring automatic reversal. *Thompson*, 238 Ill. 2d at 605. The supreme court agreed. The supreme court noted that structural errors systemically erode the integrity of the judicial process, undermining the fairness of the defendant's trial. *Thompson*, 238 Ill. 2d at 608. "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson*, 238 Ill. 2d at 609. Errors have been recognized as structural only in a limited class of cases, including: a complete denial of counsel; trial before a biased judge; racial discrimination in the selection of a grand jury; denial of self-representation at trial; denial of a public trial; and a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609.

¶ 37    The supreme court concluded:

"Rule 431(b) questioning is simply one way of helping to ensure a fair and impartial jury. [Citation.] Despite the trial court's failure to comply with Rule 431(b) in this case, there is no evidence that defendant was tried by a biased jury. We also note that the trial court did address some of the Rule 431(b) requirements in its *voir dire* and *** the jury was admonished and instructed on Rule 431(b) principles.

Although compliance with Rule 431(b) is important, violation of the rule does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or

innocence. We conclude that the trial court's violation of the amended version of Supreme Court Rule 431(b) in this case does not fall within the very limited category of structural errors and, thus, does not require automatic reversal of defendant's conviction." *Thompson*, 238 Ill. 2d at 610-11.

¶ 38    The supreme court next discussed the State's contention that Thompson had forfeited his claim by failing to object to the trial court's failure to comply with Rule 431(b) or include the issue in his posttrial motion. *Thompson*, 238 Ill. 2d at 611-12. Thompson conceded his claim was forfeited, but asked the court to relax the forfeiture rule based on the so-called "*Sprinkle* doctrine." *Thompson*, 238 Ill. 2d at 611-12. Under the *Sprinkle* doctrine, the court may relax the forfeiture rule when a trial judge oversteps his authority in the jury's presence or when trial counsel effectively has been prevented from objecting because such an objection would fall on deaf ears. *Thompson*, 238 Ill. 2d at 612. The supreme court noted there was no indication in the case before it that the trial court would have ignored trial counsel's objection to the Rule 431(b) questioning, nor was there any indication that the trial court overstepped its authority in the presence of the jury. *Thompson*, 238 Ill. 2d at 612. Accordingly, the supreme court declined to relax the forfeiture rule. *Thompson*, 238 Ill. 2d at 612.

¶ 39    The supreme court next discussed whether the trial court's failure to comply with Rule 431(b) constituted plain error. *Thompson*, 238 Ill. 2d at 613. The plain-error doctrine is applied when:

    " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Thompson*, 238 Ill. 2d at 613 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 40    Thompson did not argue plain error under the first prong, but only argued under the second prong that the Rule 431(b) violation infringed his right to an impartial jury and thereby affected the fairness of his trial and the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 613. The supreme court disagreed, noting it had equated the second prong of plain-error review with structural error. *Thompson*, 238 Ill. 2d at 613-14 (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). The supreme court held:

    "A finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process. Critically, however, defendant has not presented any evidence that the jury was biased in this case. Defendant has the burden of persuasion on this issue. We cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning.
    ***
    Our amendment to Rule 431(b) does not indicate that compliance with the rule is now indispensable to a fair trial. As we have explained, the failure to conduct Rule

-10-

431(b) questioning does not necessarily result in a biased jury, regardless of whether that questioning is mandatory or permissive under our rule. Although the amendment to the rule serves to promote the selection of an impartial jury by making questioning mandatory, Rule 431(b) questioning is only one method of helping to ensure the selection of an impartial jury. [Citation.] It is not the only means of achieving that objective. A violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of this court's rules. [Citation.] Despite our amendment to the rule, we cannot conclude that Rule 431(b) questioning is indispensable to the selection of an impartial jury." *Thompson*, 238 Ill. 2d at 614-15.

¶ 41    The supreme court noted , in the case before it, the prospective jurors had received some, but not all, of the required Rule 431(b) questioning and had been admonished and instructed on Rule 431(b) principles. *Thompson*, 238 Ill. 2d at 615. The supreme court concluded Thompson had not established that the trial court's violation of Rule 431(b) resulted in a biased jury and therefore he failed to meet his burden of showing the error affected the fairness of his trial and the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 615.

¶ 42    Finally, the supreme court declined Thompson's request to adopt a bright-line rule of reversal for any violation of Rule 431(b) to ensure that the trial courts will comply with the rule. *Thompson*, 238 Ill. 2d at 615-16.

¶ 43    In the present case, as in *Thompson*, defendant's failure to object at trial constituted a forfeiture of the circuit court's alleged error in its Rule 431(b) questioning. As in *Thompson*, defendant has failed to establish that the forfeiture rule should be relaxed under the *Sprinkle* doctrine, as there is no indication the trial court would have ignored an objection nor is there any evidence the trial court overstepped its authority in the presence of the jury. Further, defendant has failed to establish plain error. The case was not closely balanced, so the alleged error is not reversible under the first prong. See our recitation of the evidence *supra*. Nor is the alleged error reversible under the second prong. Defendant has presented no evidence the jury was biased in this case. Defendant bears the burden of persuasion on this issue, and we "cannot presume the jury was biased." *Thompson*, 238 Ill. 2d at 614. In the absence of any evidence of jury bias, defendant has failed to meet his burden of showing that the alleged Rule 431(b) violation constitutes plain error.

¶ 44    Next, defendant contends his mandatory natural life sentence imposed pursuant to section 12-14.1(b)(2) of the Criminal Code of 1961 violates the proportionate penalties clause. Section 12-14.1(b)(2) mandated the natural life sentence because defendant was convicted of predatory criminal sexual assault of a child after having previously been convicted of aggravated criminal sexual assault. See 720 ILCS 5/12-14.1(b)(2) (West 2008).

¶ 45    A statute carries a strong presumption of constitutionality. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). The party challenging the statute bears the burden of clearly establishing that it violates the constitution. *Sharpe*, 216 Ill. 2d at 487. A reviewing court has "a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done." *People v. Graves*, 207 Ill. 2d 478, 482 (2003). Courts "generally defer to the legislature in the sentencing arena because the legislature is institutionally better equipped

to gauge the seriousness of various offenses and to fashion sentences accordingly." *Sharpe*, 216 Ill. 2d at 487. The constitutionality of a statute is a matter of law subject to *de novo* review. *Sharpe*, 216 Ill. 2d at 486-87.

¶ 46    The proportionate penalties clause of the Illinois Constitution states, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has identified two distinct tests to evaluate a proportionality challenge. First, "a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *People v. Moss*, 206 Ill. 2d 503, 522 (2003). Second, "the proportionate penalties clause is violated where offenses with identical elements are given different sentences." *Moss*, 206 Ill. 2d at 522. Our supreme court recently abandoned a third method, the "cross-comparison analysis," because it had proven to be "problematic and unworkable." *Sharpe*, 216 Ill. 2d at 519.

¶ 47    Defendant challenges his sentence under the first test, arguing that his sentence was so disproportionate to the offense as to shock the moral sense of the community. Defendant argues that his offense of predatory criminal sexual assault of a child did not cause an unusually severe degree of harm to J.J. and that he likely would have been sentenced to the statutory minimum of six years in prison had he not been previously convicted of aggravated criminal sexual assault. As a result of his prior aggravated criminal sexual assault conviction, the circuit court was required under section 12-14.1(b)(2) to sentence him to natural life in prison. Defendant contends the elevation of his sentence from six years to natural life based solely on his prior aggravated criminal sexual assault conviction was not proportionate to the seriousness of the offense and shocks the moral sense of the community. Defendant argues that the extreme sanction of natural life imprisonment should be restricted to "extremely serious" cases, such as where violent injury or death resulted, or where defendant has shown no prospects for rehabilitation. Defendant contends that, since the present case is not extremely serious and since he has rehabilitative potential, we should hold that the mandatory sentencing provision of section 12-14.1(b)(2) is unconstitutional as applied to him.

¶ 48    Similar arguments were addressed in *People v. Sanchez*, 344 Ill. App. 3d 74 (2003), and *People v. Huddleston*, 212 Ill. 2d 107 (2004). In *Sanchez*, the defendant there, Juan Sanchez, Jr., was convicted of aggravated criminal sexual assault of a 13-year-old girl. *Sanchez*, 344 Ill. App. 3d at 77. He previously had been convicted of criminal sexual assault of a five-year-old child. *Sanchez*, 344 Ill. App. 3d at 79. The circuit court sentenced him to natural life in prison (*Sanchez*, 344 Ill. App. 3d at 77) pursuant to section 12-14(d)(2) of the Criminal Code of 1961, which provides that, where a person is convicted of aggravated criminal sexual assault after having been convicted of a separate criminal sexual assault, he "shall be sentenced to a term of natural life imprisonment." 720 ILCS 5/12-14(d)(2) (West 2000).

¶ 49    On appeal, Sanchez argued that his mandatory life sentence violated the proportionate penalties clause because it was so disproportionate to the offense as to shock the moral sense of the community. *Sanchez*, 344 Ill. App. 3d at 84. Sanchez contended he was convicted based on "slight and temporary bodily harm that amounted to simple battery–bruises to the victim's breast." *Sanchez*, 344 Ill. App. 3d at 84. Sanchez argued that had he not bruised the

victim's chest, he would have been convicted of criminal sexual assault and the court would only have imposed a sentence of between 30 and 60 years in prison. *Sanchez*, 344 Ill. App. 3d at 84.

¶ 50    In affirming Sanchez's conviction and his natural life sentence, we noted that section 12-14(d)(2) is a recidivist sentencing provision that has the purpose of deterring repeat offenders and " 'impos[ing] harsher sentences on offenders whose repeated convictions have shown their resistance to correction.' " *Sanchez*, 344 Ill. App. 3d at 82 (quoting *People v. Robinson*, 89 Ill. 2d 469, 476 (1982)). We further stated:

> "[T]he harm in this case is not limited to bruising of the victim's breast. The evidence at trial showed the victim was in 'severe pain' during the hospital exam and sustained bruises to her vaginal area as well as her breasts, which could have been caused from being held down. We need not speculate about the psychological harm done to victims of forcible sexual assaults. The mandatory life sentence provision reflects the legislature's decision to treat severely those who engage in repetitive conduct of sexual assault because it recognizes the harm caused to victims." *Sanchez*, 344 Ill. App. 3d at 85.

¶ 51    In *Huddleston*, the defendant there, Gerald Huddleston, was convicted of three counts of predatory criminal sexual assault of a child, with each count pertaining to a separate victim. *Huddleston*, 212 Ill. 2d at 110. The evidence showed that, in the course of his teaching duties, Huddleston placed his penis in the mouths of three different fourth-grade students. *Huddleston*, 212 Ill. 2d at 112-15. The circuit court declined to impose the mandatory sentence of natural life imprisonment required by section 12-14.1(b)(1.2) when a person is "convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts." 720 ILCS 5/12- 14.1(b)(1.2) (West 2002). The circuit court found that section 12-14.1(b)(1.2) violated the proportionate penalties clause as applied to Huddleston and sentenced him to consecutive 10-year terms of imprisonment. *Huddleston*, 212 Ill. 2d at 110.

¶ 52    On appeal, the supreme court noted, "[c]oncern for the welfare and safety of children is reflected in various criminal statutes" (*Huddleston*, 212 Ill. 2d at 133) and that section 12-14.1(b)(1.2) "was obviously intended to protect this vulnerable segment of our society from sexual predation by deterring would-be offenders and ensuring that those who commit sexual acts with multiple victims will not have the opportunity to reoffend" (*Huddleston*, 212 Ill. 2d at 134). The supreme court detailed the "considerable commentary" regarding the psychological damage suffered by children who are the victims of sexual assault (*Huddleston*, 212 Ill. 2d at 134-36) and noted that state legislatures may respond to the substantial risk of recidivism posed by sex offenders (*Huddleston*, 212 Ill. 2d at 138). The supreme court ultimately held that the sentence of natural life imprisonment, as applied to Huddleston, was not cruel, degrading, or so wholly disproportionate to his offense as to shock the moral sense of the community. *Huddleston*, 212 Ill. 2d at 141.

¶ 53    Similar to section 12-14(d)(2) discussed in *Sanchez*, and section 12-14.1(b)(1.2) discussed in *Huddleston*, section 12-14.1(b)(2) reflects the legislative recognition of the

inherent harm caused to victims of aggravated criminal sexual assault and predatory criminal sexual assault of a child. Contrary to defendant's argument, predatory criminal sexual assault of a child is "extremely serious" regardless of whether violent injury or death resulted. See *Huddleston*, 212 Ill. 2d at 134-36 (discussing the chronic psychological problems suffered by children who are the victims of sexual assault.) The mandatory sentencing provision of section 12-14.1(b)(2) is intended to protect children from sexual predators by deterring repeat offenders and by harshly punishing offenders who have shown resistance to correction so that they will not have the opportunity to reoffend.

¶ 54    Turning to the facts of defendant's case, he argues that his particular predatory criminal sexual assault did not cause an unusually severe degree of harm and, therefore, the mandatory natural life sentencing provision as applied to him violates the proportionate penalties clause. Defendant's argument is without merit. J.J. testified defendant inserted his penis into her vagina two or three times a week for three years, starting when she was 10 years old, and that defendant threatened to hurt her mother if she ever told anyone what he had done. J.J. testified to how defendant inserted his penis into her anus after he discovered she had been writing about these incidents in her diary. J.J. testified defendant caused her pain when he rubbed her vaginal area with baby oil prior to the first time he inserted his penis into her vagina, and she also testified he caused her pain when he inserted his penis into her anus. Further, J.J. stated in her victim impact statement that, "although [the] assault did not result in a death or long-term injury it still had a major emotional effect" on her, and that defendant "nearly destroyed [her] family." Clearly, defendant's repeated sexual assaults of J.J. physically harmed her and caused both her and her family severe emotional harm. Further, M.C. and Y.D. similarly testified that when defendant was dating their mother in 1988, he sexually assaulted them for approximately two years, beginning when they were, respectively, 14 years old and 8 years old. Defendant told M.C. not to tell anyone because her mother would not believe her and nobody would ever love her again; he also told Y.D. not to tell anyone and bribed her with candy and chips. Defendant's resistance to correction is demonstrated by his repeated sexual assaults over multiyear periods of the children of the women he dated. On these facts, defendant's natural life sentence does not shock the moral sense of the community as it was necessary to deprive him of the opportunity to reoffend. Accordingly, defendant's sentence was not violative of the proportionate penalties clause.

¶ 55    Defendant contends *People v. Miller*, 202 Ill. 2d 328 (2002), compels a different result. In *Miller*, the 15-year-old defendant was convicted of two counts of first-degree murder based on accountability when he acted as a lookout. *Miller*, 202 Ill. 2d at 330-31. The circuit court refused to impose the statutorily mandated sentence of natural life imprisonment under the multiple murder provision of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)), finding application of the statute to Miller would violate the proportionate penalties clause. *Miller*, 202 Ill. 2d at 330. The court instead sentenced him to 50 years in prison. *Miller*, 202 Ill. 2d at 330. The supreme court affirmed, holding that the mandatory life sentence "grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true *** where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout

during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter." *Miller*, 202 Ill. 2d at 341.

¶ 56      *Miller* is readily distinguishable, as the mandatory sentence of natural-life imprisonment does not grossly distort the factual realties of the present case. Unlike in *Miller*, defendant here was an adult in his forties and a repeat offender who, on his own accord, took his 10-year-old stepdaughter into his bedroom, sexually assaulted her over three years, and forced her to keep silent by threatening to hurt her mother and destroying her diary. Defendant was not convicted on a theory of accountability but, rather, as the principal offender. As discussed, defendant's sentence is not disproportionate to the offense in a way that shocks the moral sense of the community.

¶ 57      Next, defendant contends the mittimus incorrectly states he was convicted of predatory criminal sexual assault of a child consisting of an act of anal penetration as charged in count II, when his conviction actually was for mouth to vagina conduct as charged in count III. The State concedes the error. Accordingly, we correct the mittimus to reflect defendant was convicted of predatory criminal sexual assault of a child under count III (charging mouth to vagina contact) instead of count II (charging penis to anus contact). See *People v. Douglas*, 381 Ill. App. 3d 1067, 1069 (2008) (appellate court may correct the mittimus without remanding the cause to the circuit court).

¶ 58      For the foregoing reasons, we affirm defendant's convictions and sentence and correct the mittimus.

¶ 59      Affirmed; mittimus corrected.